811 So.2d 355 (2001)
Janet WOOTEN, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1999-KA-02108-COA.
Court of Appeals of Mississippi.
February 6, 2001.
*357 David L. Walker, Batesville, Attorney for Appellant.
Office of the Attorney General by Jeffrey A. Klingfuss, Attorney for Appellee.
Before SOUTHWICK, P.J., LEE, and THOMAS, JJ.
THOMAS, J., for the Court:
¶ 1. Ms. Janet Wooten appeals her conviction for manslaughter, raising the following issues:
I. DID THE LOWER COURT ERR IN FINDING THAT THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE SUPPORTED A CONVICTION?
II. DID THE LOWER COURT ERR IN DENYING AN OBJECTION TO THE STATE'S PRESENTATION OF TESTIMONY CONCERNING PRIOR FIGHTS BETWEEN WOOTEN AND THE DECEASED AND WERE THE JURY INSTRUCTIONS PERTAINING TO THIS TESTIMONY PROPER?
III. DID THE LOWER COURT ERR IN DENYING A U.R.C.C.P. 9.04 DISCOVERY OBJECTION?
IV. DID THE LOWER COURT ERR IN DENYING AN OBJECTION TO ENTERING SEVERAL PHOTOGRAPHS OF THE CRIME SCENE INTO EVIDENCE DUE TO THEIR GRUESOME CONTENT.
Finding no error, we affirm.

FACTS
¶ 2. The State's case in chief was based on the contention that Janet Wooten shot and killed her husband, James Wooten, because he was involved in an affair with another woman. The State called on the following witnesses to establish this assertion.
¶ 3. Pat Kazziah, the coroner/medical examiner for Tate County, MS, confirmed that James had been shot in the chest and that this wound was the cause of his death. During cross-examination, he further testified that he could smell alcohol on the body of James.
¶ 4. Dr. Steven Hayne, a forensic pathologist, testified as an expert witness. He had performed an autopsy on the body of James, where he discovered that James had been shot in the upper chest from a distance of approximately four feet. Dr. Hayne confirmed that the gunshot wound was the cause of death. Dr. Hayne testified that the wound was a typical shotgun *358 wound. Dr. Hayne stated that James was five feet, nine inches tall and weighed 220 pounds. Over Janet's discovery objection, Dr. Hayne discussed his opinion of photographs showing blood splatters on the walls. Dr. Hayne stated that the photographs indicated blood splattering of moderate velocity on a wall.
¶ 5. Annette Freeman, a dispatcher for the Tate County Sheriff's Department, testified that sometime after 11:00 p.m. on November 20, 1998, she received a call from a person who identified herself as Janet Wooten. Ms. Freeman testified that Janet claimed she had had a fight with her husband, he had threatened to kill her and she shot him. Janet continued to inform Ms. Freeman that her husband was lying on the floor, the gun was on the couch and there was blood everywhere.
¶ 6. Dudley Hill, a deputy sheriff of Tate County, was requested to respond to the call from the Wooten house. Hill found James lying on the hallway floor face down in a pool of blood. He found a shotgun on a couch at the end of the hallway. Hill took Janet into custody and transported her to jail. Hill smelled alcohol on Janet at the time of the arrest. Russell Billingsly, a sergeant of the Tate County Sheriff's Department, confirmed the location of the deceased body. He further testified that he saw two beer bottles at the site.
¶ 7. Larry Hulette, an investigator with the Tate County Sheriff's Department, also arrived at the scene of the crime. Hulette confirmed the location of the shotgun and also testified to having found one spent shotgun hull on the floor. Hulette did not question Janet on the night of her arrest because she appeared to be intoxicated and upset over the incident. The morning after the incident, Hulette questioned Janet about the fight. She told Hulette that her husband had been fighting and she feared that James was going to choke her, as he had done before. Janet told Hulette that she shot her husband as an act of self-defense.
¶ 8. Harry Floate, a second investigator with the Tate County Sheriffs Department, accompanied Larry Hulette. Floate was responsible for taking the photographs of the body and the crime scene. He testified that the photographs entered into evidence were an accurate representation of what he witnessed at the Wooten home. Floate then gave a thorough description of each photograph entered into evidence. Floate further identified the shotgun shell box that he had found in a drawer of the Wooten home. Floate also identified a shotgun hull found at the scene, as well as the murder weapon, a bolt action 410 shotgun. Floate also explained a diagram presented which accurately represented the Wooten home, and specifically the crime scene. Floate then identified a confessional statement which he had transcribed as Janet explained the incident. Janet had signed and dated the written confession the morning after the incident had occurred.
¶ 9. Janet's defense argument was based on the claim that she shot James in self-defense. Her first witness was Hulette, who testified that during his investigation of the Wooten home, he found a broken necklace on the floor, as well as several bottles of beer and alcohol. He further stated that Janet was in the den when she fired the shotgun and had no means to exit the home without passing through James. The defense also called Floate, who testified that Janet told him she thought she had shot James in the leg.
¶ 10. The defense then called Janet. She testified that after a night of drinking alcohol, she and James began to argue and fight. When the argument became physical, Janet ran into the den. James followed her screaming that he was going to *359 kill her. Janet then picked up a shotgun and told James to stop. Unfettered, James continued toward her and Janet shot him in the chest. Janet then made a 911 call. She claimed that her actions were made in self-defense.
¶ 11. On cross examination, Janet stated that her height was approximately six feet tall. Janet admitted that she had cut James' wrists in a past fight with a knife. She further admitted that there had been numerous fights between herself and James in the past. She explained that the last three years of the marriage had been bad, although she denied that James had been sleeping elsewhere two to three months before the shooting incident. Janet further denied that she had told others of her intentions to kill James.
¶ 12. The State then called rebuttal witnesses. Sidney Wooten, Jr., the father of the deceased, testified that Janet apologized to him about the incident, admitting that she "didn't have to do this."
¶ 13. Glinda Milam, the sister of the deceased, testified that she stopped by the Wooten house after work. She explained that Janet was drinking at that time and James had not arrived home for the evening yet.
¶ 14. Timothy Wooten, a brother of the deceased, testified that five years prior to the trial Janet discovered that James had been having an affair and shot a pistol at him twice. James was not hit by either shot, and the two settled the fight without physical injury. Kind Wooten, another brother of the deceased, offered testimony that supported this incident.
¶ 15. Conteia Wooten, another sister of the deceased, testified that Janet had made statements threatening to kill James. While the exact time that these statements were made is unclear, Conteia claimed that they were made in the same year that James was killed. Conteia further testified that Janet had a shotgun that she kept in the den closet and further identified the murder weapon as this same weapon.
¶ 16. Friendly Wooten, a third brother of the deceased, testified that he was supposed to meet James on the night of the shooting. James was going to Memphis to see his girlfriend. James had been living with his girlfriend for several weeks before the shooting.

ANALYSIS

I. DID THE LOWER COURT ERR IN FINDING THAT THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE SUPPORTED A CONVICTION?
¶ 17. The decision to grant or deny a motion for new trial is discretionary with the trial court. McClain v. State, 625 So.2d 774, 781 (Miss.1993). In order to preserve the issue for consideration on appeal, the defendant must raise the issue that the verdict was against the overwhelming weight of the evidence as a ground for his motion for new trial. Howard v. State, 507 So.2d 58, 63 (Miss.1987). In Ford v. State, 753 So.2d 489, 490 (Miss. Ct.App.1999), we held that:
[i]n determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence presented as supportive of the verdict, and we will disturb a jury verdict only when convinced that the circuit court has abused its discretion in failing to grant a new trial or if the final result will result in an unconscionable injustice.
Id. (citing Danner v. State, 748 So.2d 844, 846 (Miss.Ct.App.1999)). See also Turner v. State, 726 So.2d 117, 125 (Miss.1998); Groseclose v. State, 440 So.2d 297, 300 *360 (Miss.1983). "Any less stringent rule would denigrate the constitutional power and responsibility of the jury in our criminal justice system." Hughes v. State, 724 So.2d 893, 896 (Miss.1998). "In determining whether a jury verdict is against the overwhelming weight of the evidence, the court accepts as true the evidence favorable to the State." Wetz v. State, 503 So.2d 803, 812 (Miss.1987). See also McClain, 625 So.2d at 781; Van Buren v. State, 498 So.2d 1224, 1229 (Miss.1986). It has also been established that "the jury is the judge of the weight and credibility of testimony and is free to accept or reject all or some of the testimony given by each witness." Meshell, 506 at 991. See also Hilliard v. State, 749 So.2d 1015, 1017 (Miss.1999); Lewis v. State, 580 So.2d 1279, 1288 (Miss.1991); Gandy v. State, 373 So.2d 1042, 1045 (Miss.1979). The "testimony of a single uncorroborated witness is sufficient to sustain a conviction... even though there may be more than one person testifying to the contrary." Williams v. State, 512 So.2d 666, 670 (Miss.1987). We hold that the verdict was not against the overwhelming weight of the evidence.
¶ 18. A (1) motion for a directed verdict, (2) request for peremptory instruction, and (3) motion for judgment notwithstanding the verdict challenge the legal sufficiency of the evidence. McClain, 625 at 778. "Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court." McClain, 625 at 778. This occurred when the lower court denied the motion for JNOV. Wetz, 503 So.2d at 807-8. "If there is sufficient evidence to support a verdict of guilty, this Court will not reverse." Meshell v. State, 506 So.2d 989, 990 (Miss. 1987). See also Haymond v. State, 478 So.2d 297, 300 (Miss.1985); Fairley v. State, 467 So.2d 894, 902 (Miss.1985). The test to be applied in considering the sufficiency of the proof based on circumstantial evidence is "whether a rational fact finder might reasonably conclude that the evidence excludes every reasonable hypothesis inconsistent with guilt of the crime charged." Shields v. State, 702 So.2d 380, 382 (Miss.1997) citing Deloach v. State, 658 So.2d 875, 876 (Miss.1995). See also Murphy v. State, 566 So.2d 1201, 1204 (Miss. 1990). We hold that the evidence was sufficient to support the verdict.
¶ 19. As part of Janet's attack on the sufficiency of the evidence, she urges that the court should apply the Weathersby Rule. Weathersby v. State, 165 Miss. 207, 147 So. 481, 482 (1933). However, Weathersby established that:
where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.
Id. Weathersby is good law. See Thibodeaux v. State, 652 So.2d 153, 166 (Miss. 1995). However, in the case sub judice, Wooten's testimony, although the sole eyewitness testimony to the homicide, is substantially contradicted in material particulars by credible witnesses, as well as by the physical facts. Therefore, the Weathersby Rule does not apply.

II. DID THE LOWER COURT ERR IN DENYING AN OBJECTION TO THE STATE'S PRESENTATION OF TESTIMONY CONCERNING PRIOR FIGHTS AND WERE THE JURY INSTRUCTIONS PERTAINING TO THIS TESTIMONY PROPER?

*361 A. MISSISSIPPI RULE OF EVIDENCE 404(b) RULING
¶ 20. During the State's cross-examination of Janet, the following colloquy and ruling of the court occurred:
Q: Do you remember me asking Dr. Steve Hayne about cuts on the back of James' hands?
A: Yes.
Q. You know how those cuts got there, don't you?
A. Yes, I do.
Mr. Walker: Your Honor, I object as irrelevant.
The Court: Based on the record, I'll overrule the objection.
Q. The cuts on the back of James' hands were put there by you when you cut him with a razor isn't that right?
A. Not with a razor.
Q. What did you cut him with?
A. It happened once when we was fighting and it was a knife, I think, and not a razor.
Q. A knife? Once when you were fighting you cut him with a knife so he had scars on the back of his hands. Okay. Now, you've shot at him before, haven't you?
Mr. Walker. Your honor, same objection.
The Court. Let me see counsel at bench.
(Off-the-record conference at bench)
(The jury retires to the jury room)
(The following proceedings take place in open court. The defendant is present with her attorney. The jury is not present.)
The Court: Mr. Kelly, let me make sure where we're going with all this, all these prior acts, altercations between the defendant and the decedent. How far are we going with all this?
Mr. Kelly: Your Honor, I will try to explain to you what information I have available to me.
In talking with Sidney Wooten, the father of James Wooten, I believe that Sidney Wooten would testify, if called as a witness, that he spoke with Janet Wooten on the phone, that Janet Wooten said words to the effect of: I am so sorry; I did not have to do that to James.
As Janet Wooten has already admitted, she had cut James Wooten on the hands and wrists, causing scars described by Steve Hayne. In the event that Janet had denied that, I had a witness named Ruby Mays who would testify to that effect.
I've now asked the defendant if she'd ever shot at the victim. I don't know what her answer will be but I have information from a witness named Kind Wooten who would testify that he has seen Janet Wooten shoot at James Wooten.
Timothy Wooten would testify, if asked, if I set up the proper cross examination, that in the past he has seen Janet Wooten with a pistol, that James Wooten tried to run from her, and Janet Wooten, in fact, shot two times at James Wooten. And that Janet has been known to carry a razor.
Conteia Wooten would testify that she works with the defendant or used to work with the defendant, that they rode to work together, that Conteia knows the defendant's drinking habits, and in the past the defendant has threatened to kill the victim.
And that would be the extent of the cross examination and the propose rebuttal witnesses by the state.

*362 Mr. Walker: Your Honor, we would strongly object to that. We didn't bring it up in our direct examination of Mrs. Wooten. We assert that it's irrelevant pursuant to Mississippi Rules of Evidence 401, 402 and 403, and also ask the court to apply Mississippi Rules of Evidence 404(b). If one believes Mr. Kelly's proffer of proof on a shooting, then obviously it's an aggravated assault, so you have two aggravated assaults for which she's not been tried and convicted of. That brings up a 404(b) analysis. Injecting this material into the trial would violate her state and federal constitutional rights to a fair trial and due process of law as stated in Article 3, Sections 14 and 26 of the State Constitution of 1890, as well as equivalent federal provisions.
It's been a clean trial basically so far, Judge, just some relatively routine objections. This lady has made out a self-defense claim. The state is trying to get a manslaughter case to the jury. All this material is just not relevant, it's prejudicial, it's unfair, violates the constitutional principles we've cited.
The Court: Anything further from the state?
Mr. Kelly: Yes, sir. Your Honor, it's the state's position that when there is a question raised by the defendant as to who was the aggressor that the state should be allowed to prove prior bad acts of aggression from the defendant toward the victim and that is what the cross examination and hoped for rebuttal will establish, in that, in fact, this defendant did not have to kill, that in the past she was the aggressor and very able to fend for herself.
Mr. Walker: One final comment I will make, Your Honor, is Mr. Kelly has not established any time frames. Are we talking a week before November 20th, 1998, a year, two years, three years?
The Court: Under Rule 404(b) it states that evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
Here it's clear what the respective positions of the parties are, that being that the defendant claims self-defense, that her husband Mr. Wooten was the aggressor on that night. The state has a right to test that testimony, to attack the testimony by way of attacking the credibility of the witness. And again, Mrs. Wooten's position being that her husband was the aggressor and that she was not, and certainly she has a right to assert that and present that to the jury for the jury's consideration.
On the other hand, the state has a right to attack it. The court feels that this evidence would be admissible under Rule 404(b). And having made that finding, then the court has to look at this evidence and evidence offered to be presented by the state under Rule 403, that being although relevant the evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues or misleading the jury.
Here the court feels the probative value is not substantially outweighed by the danger of unfair prejudice and *363 the jury can be instructed through a limited instruction which I request the state to prepare on that testimony as to these other acts. With that having been said, the court will permit the examination. The defendant's objection will be noted.
¶ 21. As we noted earlier, both Timothy and Kind Wooten testified in the State's rebuttal that in a fight prior to the incident at hand Janet had shot at James twice after finding out that James was involved in an affair. Janet argues here that the cross-examination by the State and the rebuttal concerning a prior shooting should not have been admitted. As is readily apparent from the record, the court conducted an appropriate 404(b) balancing analysis.
¶ 22. It has been established by the Mississippi Supreme Court that:
Wherever 404(b) evidence is offered and there is an objection which is overruled, the objection shall be deemed an invocation of the right to MRE 403 balancing analysis and a limiting instruction. The court shall conduct an MRE 403 analysis and, if the evidence passes that hurdle, give a limiting instruction unless the party objecting to the evidence objects to giving the limiting instruction.
Webster v. State, 754 So.2d 1232, 1240 (Miss.2000). See also Alford v. State, 760 So.2d 48, 52 (Miss.Ct.App.2000); Underwood v. State, 708 So.2d 18, 32 (Miss.1998).
¶ 23. In the case sub judice, the trial court held that the testimony relating to the prior fights fell under M.R.E. 404(b), as it was evidence to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The trial court had a factual basis to rule as it did, followed the correct legal standard to admit the evidence, and we hold that the trial court was not in error. Therefore, the testimony relating to the prior fights was admissible.

B. THE LIMITING JURY INSTRUCTION
¶ 24. Janet next complains that the limiting instruction given by the court was partly in error. The court granted the following instruction:
Members of the Jury, the Court allowed testimony of other alleged altercations and/or threats between Janet Wooten and James Wooten, supposedly occurring prior to November 20, 1998. First of all, you may determine what the true facts and circumstances were regarding these alleged prior altercations. As to any of these alleged prior altercations between Janet and James Wooten, you may consider this evidence as it relates to proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, on the part of Janet Wooten on November 20, 1998. You may also consider this evidence in judging the credibility of Janet Wooten. However, you are cautioned that you cannot and must not consider this evidence of other alleged altercations between Janet and James Wooten as substantive evidence on the issue of whether Janet Wooten is guilty of the crime of manslaughter, the charge for which she is on trial today.
Janet charges that the following sentence in the instruction was erroneously given: "You may also consider this evidence in judging the credibility of Janet Wooten." The pertinent part of Janet's brief on this point states:
This instruction singled out the Appellant as a witness and instructions in a criminal prosecution should not single out or contain comments on specific evidence. Duckworth v. State, 477 So.2d 935, 938 (Miss.1985). The trial court *364 thus committed reversible error in giving this instruction.
While the generic language of Duckworth is a proper statement of the law, it has nothing to do with the issue presented here. Janet cites no other case law to support this argument.
¶ 25. In Hughes v. State, 735 So.2d 238, 259 (Miss.1999), the Mississippi Supreme Court found no error in the language used in a jury instruction almost identical to the language here. The language in Hughes read as follows: "As with all other witnesses, you may give the testimony of Ms. Sanders what weight and credit you deem proper under the circumstances, and in judging the credibility of her testimony..." Hughes, 735 So.2d at 259. Therefore, this assignment of error is without merit.

III. DID THE LOWER COURT ERR IN DENYING A U.R.C.C.P. § 9.04 DISCOVERY OBJECTION?
¶ 26. Janet objected to the presentation of Dr. Hayne's expert opinion testimony concerning photographs showing blood splatters as a violation of U.R.C.C.P. § 9.04 due to the fact that this testimony was not disclosed to Janet prior to the trial. The pertinent portion of the record states:
Q: Now, sir, when an injury of that type is sustained by a human being, is there sometime what is referred to as blood spatters?
A: Yes, sir.
Q: Explain to the members of the jury what blood spatters
Mr. Walker: Your Honor, I'm going to object. That is not in Dr. Hayne's report. Discovery violation, 9.06.
The Court: Any response?
Mr. Kelley: Yes, Your Honor. Before trial began, I afforded Mr. Walker the opportunity to view the photographs which the state has in his possession and I'm hoping to use the photographs and have Mr. Hayne explain what this external blood splattering is.
Mr. Walker: I don't challenge the photographs, Your Honor. Mr. Kelly's comments are accurate. But he's asking Dr. Hayne to give an opinion that's not in his report. That's a violation of Rule 9.06.
The Court: The objection has been noted. I'll overrule it.
Q: Dr. Hayne, I have handed you two photographs. To the best of my knowledge and belief, you've never seen those photographs before?
A: I have not, sir.
* * *
Q: Dr. Hayne, when a gunshot wound is inflicted upon a body of James Wooten as you have previously described, does that cause any external bleeding?
A: Yes, sir.
Q: And where would the external bleeding originate from?
A: The bleeding would occur initially from the entrance gunshot wound site, blood coming out of the wound track, and there would also be over a short period of time blood exiting through the mouth and the nose. And there could be blood getting access to the upper airway from the gunshot wound of the lung. So there could be initially blood leaving the entrance gunshot wound, which is the sole defect in the body from the gunshot wound and then followed by blood getting propelled out of the nose and mouth.
Q: When blood circulates inside a human being, does it have a pressure or force during the period of circulation?

*365 A: Yes, sir.
Q: And when a gunshot wound such as you have described strikes the body of a human being, what happens to that circulated blood?
A: It's released under pressure and pressure can go up to approximately 120 millimeters pressure, which is a substantial amount of pressure. And, of course, if there is a defect where blood can gain access outside the body, it not uncommonly leaves the body and would be thrown from the body to the outside surface.
Q: For example, if Mr. Wooten was standing at or near a wall when the shot struck his body, would there be enough pressure for the blood to, in fact, exit the body and lodge on a wall itself?
A: Yes, sir, I'd expect that from a shotgun wound.
Q: Relating to Exhibits Four and Five, does that indicate what appears to be blood on any area surface which purports to be or appears to be a wall?
A: Yes, sir, there are actually two photographs. One appears to be a closer view of the State's Four, which is a more distant view of a wall, showing blood spattering of moderate velocity.
Mr. Walker: Your Honor, may I have a continuing objection under Rule 9.04. I think I misspoke earlier and said 9.06, but it's 9.04.
The Court: Alright, sir, it will be so noted.
A: (continuing) And there is also what appears to be blood on the opposite side wall of this hallway, which appears to be a smear rather than a spattering.
Mr. Kelley: Your Honor, that's all the direct examination I have of Dr. Hayne. I tender him for cross examination.
The Court: Cross examine?
CROSS EXAMINATION BY
Mr. Walker:
Q: Dr. Hayne, your last series of comments, are those collaborated by your report anywhere? Are they in your report?
A: No, sir, I did not address that in my report and the first time I've been asked to even look at or address that is the last five or ten minutes.
¶ 27. The relevant portion of Rule 9.04 is as follows:
The prosecution shall disclose to each defendant or to his attorney, and permit him to inspect, copy, test, and photograph upon request and without the necessity of court order the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence my become known to the prosecution:
(4) Any reports, statements, or opinions of experts, written, recorded or otherwise preserved, made in connection with the particular case and the substance of any oral statement made by any such expert;
(5) Any physical evidence and photographs relevant to the case or which may be offered in evidence ...
U.R.C.C.P. § 9.04.
¶ 28. The essential purpose of Rule 9.04 is the elimination of trial by ambush and surprise. Robinson v. State, 508 So.2d 1067, 1070 (Miss.1987). Disclosure is the hallmark of fairness and the quest for justice that should be the goal of the criminal justice system. Id. at 1070. *366 When faced with a discovery violation, technical or otherwise, the trial court should follow the following procedure, as set out in Box:
1) Upon defense objection, the trial court should give the defendant a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness, inspecting the physical evidence, etc.
2) If, after this opportunity for familiarization, the defendant believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue.
3) If the defendant does request a continuance the State may choose to proceed with trial and forego using the undisclosed evidence.
Box v. State, 437 So.2d 19, 23-24 (Miss. 1983). Failure to follow the Box guidelines is prejudicial error. Darghty v. State, 530 So.2d 27, 32 (Miss.1988).
¶ 29. In Inman v. State, the Mississippi Supreme Court noted that there is no hard and fast rule determining how much time is a reasonable time for the defense to assimilate unexpected and previously undisclosed evidence offered by the State. Inman v. State, 515 So.2d 1150, 1153 (Miss.1987). Where the State is tardy in furnishing discovery which it was obligated to disclose and after an initial objection is made by the defense, the defendant is entitled upon request to a continuance postponement of the proceedings reasonable under the circumstances. Inman, 515 So.2d at 1153 (quoting Foster v. State, 484 So.2d 1009 (Miss.1986)). Before this procedure can be followed it is incumbent upon the defendant to make a timely objection. Nixon v. State, 533 So.2d 1078, 1090 (Miss.1987).
¶ 30. Janet met her obligation under the first prong of the Box analysis upon making the initial objection to the offending testimony. However, Janet did not request a continuance in order to review Dr. Hayne's opinion of the blood splatters. It is the responsibility of defense counsel to request a continuance if unfairly surprised and, if requested, the trial court should almost certainly grant it. By failing to do so, Janet waives the issue for appeal. Prewitt v. State, 755 So.2d 537, 540-41 (Miss.Ct.App.1999).
¶ 31. Furthermore, a violation of Rule 9.04 is considered harmless error unless it affirmatively appears from the entire record that the violation caused a miscarriage of justice. Buckhalter v. State, 480 So.2d 1128, 1128 (Miss.1985); Prewitt, 755 So.2d at 540-41. Where the discovery violation results in the admission of evidence that is merely cumulative, the error is harmless. Beckwith, 707 So.2d at 576; Prewitt, 755 So.2d at 540-41.
¶ 32. Janet has failed to show how she was prejudiced or in any way incriminated by the admission of the blood splatter testimony. Furthermore, this testimony established nothing more than the obvious; that is that James was shot at close range and the force of the shot produced an exit wound which caused blood to splatter on the wall behind him.
¶ 33. The discovery violation here, if indeed it can be classified as such, is a harmless error. Buckhalter v. State, 480 So.2d 1128 (Miss.1985); Gallion v. State, 396 So.2d 621 (Miss.1981); Spots v. State, 427 So.2d 127 (Miss.1983); Prewitt, 755 So.2d at 540-541.

IV. DID THE LOWER COURT ERR IN DENYING AN OBJECTION TO ENTERING SEVERAL PHOTOGRAPHS OF THE CRIME SCENE INTO EVIDENCE DUE TO THEIR GRUESOME CONTENT?
*367 ¶ 34. It is a firmly established rule in this state that the admissibility of photographs rests within the sound discretion of the trial judge. Westbrook v. State, 658 So.2d 847, 849 (Miss.1995) (citing Griffin v. State, 557 So.2d 542 (Miss.1990)). See also Walters v. State, 720 So.2d 856, 861 (Miss.1998); Mackbee v. State, 575 So.2d 16, 31 (Miss.1990). "The decision of the trial judge will not be disturbed absent a showing of an abuse of discretion." Westbrook, 658 So.2d at 849 (citing Herring v. State, 374 So.2d 784, 789 (Miss. 1979)). See also Knight v. State, 751 So.2d 1144, 1150 (Miss.Ct.App.1999); Cohen v. State, 732 So.2d 867, 872 (Miss.1998). The discretion of the trial judge is that of almost "unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." Westbrook, 658 So.2d at 849 (quoting Hart v. State, 637 So.2d 1329, 1335 (Miss.1994)). See also Brooks v. State, 748 So.2d 736, 743 (Miss.1999). "Photographs that are gruesome or inflammatory or that lack an evidentiary purpose are inadmissible as evidence." McNeal v. State, 551 So.2d 151, 159 (Miss.1989). See also Cabello v. State, 471 So.2d 332, 341 (Miss.1985); Billiot v. State, 454 So.2d 445, 449-60 (Miss.1984).
¶ 35. The photographs complained of here show the body and surrounding area. They illustrate where and how the victim was shot and the surrounding crime scene. We hold that the trial court was well within its discretion in allowing those photographs.
¶ 36. THE JUDGMENT OF THE CIRCUIT COURT OF TATE COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY YEARS WITH FIVE YEARS SUSPENDED IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO TATE COUNTY.
McMILLIN, C.J., SOUTHWICK, P.J., PAYNE, BRIDGES, LEE, and MYERS, JJ., concur. KING, P.J., and IRVING, J., concur in result only. CHANDLER, J., not participating.